Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued April 12, 2004          Decided July 9, 2004

No. 03-1025

PACIFIC GAS AND ELECTRIC COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CALIFORNIA POWER EXCHANGE CORPORATION, ET AL.,
INTERVENORS

————

Consolidated with
03-1108, 03-1305

————

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

————

*Stan Berman* argued the cause for petitioner. With him on the briefs were *Paul B. Mohler* and *Mark D. Patrizio*. *Joseph H. Fagan* entered an appearance.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Beth G. Pacella*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Cynthia A. Marlette*, General Counsel, *Dennis Lane*, Solicitor, and *Larry D. Gasteiger*, Attorney.

*Robert H. Loeffler*, *Paul W. Fox*, *Andrea M. Settanni*, *Margaret A. Moore*, and *Alan Z. Yudkowsky* were on the brief for intervenors. *Bruce A. Eisen* and *David O. Bickart* entered appearances.

Before: EDWARDS, SENTELLE and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: Petitioner, the Pacific Gas & Electric Company ("PG&E"), seeks this Court's review of final orders issued by the Federal Energy Regulatory Commission ("FERC") that establish a procedure for funding the wind-up costs of the now-defunct California Power Exchange Corporation ("CalPX"). Those orders established a regime whereby former CalPX customers, like PG&E, were assessed a charge for CalPX's wind-up costs that correlated to the absolute value of any outstanding account balances the customers had with CalPX as of March 13, 2002. Because the cost-allocation methodology is both unreasonable and violates the filed-rate doctrine, we vacate the orders and remand the matter to FERC for further consideration.

## I.  Background

In 1996, California restructured its electric power industry to a market-based rate system. In doing so, it created CalPX, a non-profit entity that provided various auction markets for the trading of electricity under FERC-approved tariff and rate schedules. Under this system, CalPX determined the amounts to be paid by buyers purchasing power and how those amounts would be distributed to the sellers. CalPX recovered its administrative costs by assessing a FERC-approved charge to entities using its services.

In 2000, wholesale prices for electricity in California increased dramatically and resulted in the now-infamous California energy crisis. PG&E paid the higher prices, but owing to price freezes on retail rates, PG&E could not pass along the increased costs to its customers. Ultimately, PG&E could not meet its obligations to CalPX, its credit ratings were reduced, and it filed for Chapter 11 bankruptcy.

Shortly thereafter, FERC began an investigation into the California energy crisis. The many matters at issue in that investigation have been consolidated and are collectively referred to as "the Refund Proceedings." Those Refund Proceedings are massive in scope, but only a narrow segment is pertinent to this case, as detailed below.

FERC first determined that prospective relief was insufficient, and that refunds related to transactions in the electricity spot markets operated by the California Independent System Operator ("CAISO") and CalPX were appropriate. Refunds of approximately three billion dollars have been tentatively granted. *San Diego Gas & Elec. v. Sellers of Energy and Ancillary Services into Markets Operated by the Cal. Indep. Sys. Operator and the California Power Exch.*, 102 FERC ¶ 61,317, *order on reh'g*, 105 FERC 61,066 (2003). These determinations are on appeal before the United States Court of Appeals for the Ninth Circuit. *Cal. Pub. Util. Comm'n v. FERC*, Nos. 01-71051, *et al.* (9th Cir.). In addition to the Refund Proceedings, the events surrounding the California energy crisis have spawned a variety of litigation, some of it criminal.

Also as a result of the California energy crisis, CalPX was suspended from operating its markets. *In re Cal. Power Exch.*, 245 F.3d 1110, 1119 (9th Cir. 2001). In October 2001, sellers in the California market, acting through the "CalPX Creditors Committee," filed a proposal with FERC requesting a distribution of CalPX funds. FERC deferred the issue, pending resolution of the Refund Proceedings. *San Diego Gas & Elec. v. Sellers of Energy and Ancillary Services into Markets Operated by the Cal. Indep. Sys. Operator and the California Power Exch.*, 97 FERC 61,301, 62,417 (2001).

FERC has also denied several other requests from individual sellers to release CalPX collateral and funds, again stating that the proper allocation cannot be made until the Refund Proceedings are resolved. FERC's denials of these requests are on appeal to this Circuit. *Constellation Power Source, Inc. v. FERC*, No. 02-1367 (consolidated with *Powerex Corp. v. FERC*, No. 03-1285).

With CalPX out of the energy business, its sole remaining function is "winding up" its business affairs. This includes several responsibilities, such as: (1) acting as custodian of certain financial rights owed by and to participants in its defunct markets; (2) acting as records custodian for transactions in California's markets; and (3) participating in ongoing Commission and judicial proceedings. In other words, CalPX is complying with the Refund Proceedings. Because it is no longer in the energy business, CalPX has no current funding source during the wind-up period. According to CalPX, without some source of revenue, it would have exhausted its reserve of operating funds by August of 2002. FERC's attempt to remedy this problem is the subject of this petition.

In order to recover its operating cost during the wind-up period, CalPX filed a new rate schedule under the Federal Power Act § 205, 16 U.S.C. § 824d, to "apportion the costs of CalPX's wind-up and ongoing operations equitably among the participants for whose benefit CalPX is continuing those operations." FERC agreed, and ultimately adopted a regime whereby CalPX's costs would be allocated among its participants in proportion to their relative exposure, as measured by the absolute value of their current payables and receivables, with CalPX. FERC stated that "[t]his is consistent with the fact that CalPX's ongoing activities are essentially centered around the appropriate and orderly disposition of these payables and receivables." *Cal. Power Exch.*, 100 FERC 61,178, 61,637 (2002). Thus, any party that has a balance (positive or negative) outstanding with CalPX is required to pay a percentage of CalPX's wind-up costs equal to its percentage of the total outstanding account balances. Additionally, FERC found that CalPX was required to use "the most current account information," which was reflected in the March 13,

2002 Account summaries (the "Account Balances"). *Id.* Furthermore, recognizing that the outstanding balances would change pursuant to the ongoing Refund Proceedings, FERC required CalPX to modify the allocation in subsequent six-month rate filings to track any changes. *Id.* From that time until oral argument in this case, the March 13, 2002 Account Balances have been used for each six-month period. Finally, FERC also excluded CAISO's account balance, which is the largest outstanding balance amount in CalPX's account, from the cost allocation.

PG&E, among others, sought a rehearing of FERC's August 8, 2002 Order that adopted CalPX's wind-up charges. PG&E argued that FERC's Order violated the filed-rate doctrine by imposing new charges for past services. FERC disagreed, claiming that PG&E was confusing two distinct issues: rates previously charged for transactions in the CalPX market; and the responsibility for newly incurred wind-up costs. PG&E also challenged CalPX's reliance on March 13 Account Balances as the basis for allocating cost among participants. FERC denied rehearing on this claim as well, because it "believe[d] that the primary focus of CalPX's on-going activities is to support this Commission's efforts to calculate just and reasonable rates and associated refunds" for participants in CalPX's markets, including PG&E. *Cal. Power Exch.*, 101 FERC 61,330, 62,370 (2002). According to FERC, "each participant's Account Balance was the best approximation of what the participant would ultimately owe to, or be owed by, the CalPX," once all the refund proceedings and related matters were resolved. *Id.*

PG&E further argued that CAISO's account balance should have been included in the cost allocation. FERC defended the exclusion of CAISO's balance from the cost allocation on the ground that "any real-time energy charges assessed to CalPX by CAISO would have been assessed to it as a scheduling coordinator for its customers; i.e. PG&E." *Cal. Power Exch.*, 102 FERC 61,208, 61,606 (2003). Therefore, those amounts were already reflected in the Account Balances and used to determine the cost allocation. Any counting of CAISO's balances would therefore result in double-counting,

because FERC considers CAISO a flow-through entity. FERC offered the further justification that CAISO, as a non-profit entity, had no stake in the outcome of the Refund Proceedings. *Id.*

Having not received the relief it requested below, PG&E now petitions this Court for review of FERC's orders. Under the current scheme, PG&E pays 76 percent of CalPX's wind-up costs.

## II.  Analysis

A reviewing court sets aside final action of FERC if that action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *Sithe/Independence Power Partners v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999). FERC "must be able to demonstrate that it has made a reasoned decision based upon substantial evidence in the record." *Northern States Power Co. v. FERC*, 30 F.3d 177, 180 (D.C. Cir. 1994). We also must ensure that FERC "articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations omitted). For reasons more fully set forth below, we hold that FERC's decision does not survive that standard of review.

### A.  The Filed-Rate Doctrine and Rule Against Retroactive Ratemaking

Citing the filed-rate doctrine, PG&E contends that FERC erred in allocating CalPX's administrative wind-up costs based on balances PG&E incurred for previous transactions. The filed-rate doctrine "bars a regulated seller . . . from collecting a rate other than the one filed with the Commission and prevents the Commission itself from imposing a rate increase for [power] already sold." *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 578 (1981). According to PG&E's theory of the case, FERC violated the filed-rate doctrine and the rule against retroactive ratemaking by effectively changing the rate of those previous purchases. It did so by using

outstanding balances resulting from those prior transactions to determine PG&E's share of CalPX's current operating, or wind-up, costs. PG&E points out that at the time it took service from CalPX, it paid CalPX a FERC-accepted tariff designed to cover CalPX's administrative costs. Now, however, FERC is using those same prior transactions to determine how much PG&E should pay in new charges to cover CalPX's new administrative costs.

According to PG&E, "the wind-up charges are additional charges for further administrative activities related to service that has already been provided." Furthermore, "winding-up its operations is merely a euphemism for continued billing adjustments for service taken in the 2000 and 2001 period." In other words, these new charges reflect an additional charge, not related to any new FERC-jurisdictional business. Even FERC admits that "costs are being incurred to resolve matters related to the market as it operated during [the customer's] participation." *Cal. Power Exch.*, 101 FERC 61,330.

PG&E argues the imposition of this fee violates the filed-rate doctrine. This Court has held that "even costs . . . incurred in order to provide current or future service cannot be retroactively billed to customers based on their past purchasing decisions." *Panhandle Eastern Pipeline Co. v. FERC*, 95 F.3d 62, 68 (D.C. Cir. 1996). PG&E argues it is now paying a surcharge on the previous service with no notice of the potential increased charge at the time of the prior transactions. We have repeatedly held that customers must have adequate notice before the approved rate is changed. *See Pub. Utils. Comm'n of Cal. v. FERC*, 988 F.2d 154, 164 (D.C. Cir. 1993); *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 579-80 (D.C. Cir. 1990); *Columbia Gas Transmission v. FERC*, 831 F.2d 1135, 1140-42 (D.C. Cir. 1987).

For its part, FERC contends that because the charges are new charges for the costs of CalPX to wind-up its operations, it is not engaged in retroactive rulemaking, nor does its action violate the filed-rate doctrine. FERC argues that "PG&E . . . confuses two distinct issues: rates previously charged for

transactions in the CalPX markets . . . and responsibility for the CalPX's newly incurred wind-up administrative costs." *Cal. Power Exch.*, 101 FERC 61,330 at 62,370. According to FERC, these new administrative costs are occurring precisely for the benefit of parties like PG&E, so that there can be an appropriate and orderly disposition of payables and receivables. FERC admits that the allocation of the wind-up costs are based on previous purchases, but argues that nothing in the filed-rate doctrine or rule against retroactive ratemaking prohibits such action. FERC also claims that PG&E was on notice, as FERC publicly issued orders that CalPX would have to perform wind-up activities. *Id.*

We agree with PG&E. FERC's imposition of additional charges on CalPX's customers allocated on the basis of their prior purchases without reflection of any new jurisdictional services directly violates the filed-rate doctrine or the rule against retroactive ratemaking. Otherwise put, the assessment of the wind-up charges is directly tied to past jurisdictional services – specifically, the outstanding balances resulting from CalPX's operation of a wholesale electricity market. CalPX's former customers, including PG&E, have already paid the filed rate for this service. Therefore, any imposition of new costs based on these previous transactions is prohibited.

Moreover, the former CalPX participants, like PG&E, had no notice at the time they paid the filed rate that they would be assessed an additional charge at a later date because they used those services. In an effort to show that market participants were on notice that CalPX would have to perform wind-up activities, FERC points to an Order issued on December 20, 2002 where it stated as much. This Order, issued well after CalPX ceased operations, obviously could not have given notice to market participants at the time of their purchasing decisions.

B. Cost-Causation Principles

PG&E also challenges the use of the March 13 Account Balances as violating cost-causation principles. "It has been traditionally required that all approved rates reflect to some

degree the costs actually caused by the customer who must pay them." *K N Energy v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1991). According to PG&E, the account balances of individual CalPX participants have no causal relationship to the wind-up costs. Specifically, PG&E is paying 76 percent of the wind-up costs because it was in bankruptcy and not able to pay off its account balances prior to March 13, 2002. PG&E then identifies California Edison, which also had large account balances, but came into sufficient cash to pay off its account two weeks prior to March 13. Now, California Edison owes 0.72 percent of CalPX's wind-up costs, while PG&E owes 76 percent. According to PG&E, the system simply punishes those with outstanding balances, although it is not based on any causation or potential reward. CalPX would be doing the exact same work if PG&E had paid off its balances, but PG&E would not be required to pay the same amount. In sum, PG&E argues that there is no record evidence, or logical link, between the outstanding account balances and the CalPX's wind-up cost.

FERC claims that the order applied the "well-established ratemaking principle that 'costs should be allocated, where possible, to customers based on customer benefits and cost incurrence.'" *Cal. Power Exch.*, 101 FERC 61,330 at 62,370. FERC argues that it has used this procedure before, and cites instances where this Court affirmed a roll-in to all transmission customers of system-upgrade costs because those improvements benefitted the entire system. *See Mass. Elec. Co. v. FERC*, 165 F.3d 922, 927–28 (D.C. Cir. 1999).

From that starting proposition, FERC argues that it found "the magnitude of each Account Balance correlates with the importance to each participant of the Commission's efforts to calculate just and reasonable rates and associate refunds, if any, because the larger the Account Balance, the greater the impact of the refund proceeding on the participant." *Cal. Power Exch.*, 101 FERC 61,330 at 62,370. In other words, FERC argues that the size of a customer's account balance approximates their "stake" in CalPX's wind-up activities.

FERC's argument fails. There is nothing in the record to support any correlation between the size of an account balance and the magnitude of the relevant former CalPX customer's likely benefit from, or stake in, CalPX's wind-up activities. An example shows the fallacy of FERC's argument: had PG&E completely paid off its account at the same time as California Edison, it would have the same stake in the outcome and, more importantly, CalPX's wind-up costs would be the same, but PG&E would not be paying 76 percent of the cost. FERC basically gives this argument away in its brief while defending a separate point. It concedes that "even if [PG&E] paid off its account balance, it would not impact the [CalPX's] continuing obligations."

Finally, FERC's reliance on *Massachusetts Electric* is misplaced. That case involved FERC's decision to pass along costs associated with improving a system to all of the system's users. 165 F.3d at 927-28. It simply stands for the proposition that "when a system is integrated, any system enhancements are presumed to benefit the entire system." *Id.* at 927. That general proposition is not at issue in this case.

In sum, other than the fact that outstanding account balances are a mathematically simple way to allocate cost, we can find no reason why they serve as an appropriate or reasonable basis for doing so. FERC's method of allocating cost is unreasonable, and cannot meet the basic requirements imposed by the cost-causation principle.

C. Exclusion of CAISO's Account Balance

PG&E also argues that even if every other aspect of the allocation is legitimate, the exclusion of sales to CalPX through CAISO markets improperly increases the burden on PG&E. CAISO has the largest outstanding balance of any customer, but FERC decided to exempt that balance from the equation because CAISO was a scheduling coordinator for other entities, like PG&E. According to FERC, because the costs would be passed on to CAISO's customers, like PG&E, including CAISO's balance would be "double counting."

PG&E claims that this explanation does not square with FERC's allocation methodology. Because FERC considers absolute outstanding account balances in allocating costs, a buyer and a seller could be assessed a charge on an account for the same megawatt sold. Thus, double-counting exists under the regime, but not if the seller was CAISO.

FERC responds that while sellers' and buyers' outstanding balances are equally assessed, the same balance is not double counted. Because any amount assessed to CAISO would also be assessed to its customers, the result would be double counting the same account, not counting two different accounts from the same transaction. Finally, FERC cites the fact that CAISO is a not-for-profit entity with no stake in the Refund Proceedings – any refunds will flow through CAISO directly to its customers. In sum, FERC contends that because CAISO is a flow-through entity, the cost allocation is properly assessed on its customers, not on it.

Again, FERC's arguments are unconvincing. FERC's double-counting argument makes no sense in light of its justification for its cost-allocation scheme. If, as FERC argues, the absolute value of a party's balance correlates with the magnitude of its stake in CalPX's wind-up activities, then CAISO's stake should be proportional to its balance. The fact that the money owed by CalPX to CAISO is the "same" money owed to CalPX by participants, such as PG&E, has no bearing on CAISO's stake as a CalPX creditor in the calculation of refunds. As to FERC's assertion that CAISO has no stake in CalPX's wind-up activities because any money refunded to CAISO would simply pass through to CAISO's customers, CAISO's outstanding account balance would be just as reflective of its customers' stake in the outcome as PG&E's outstanding balance is reflective of its stake. Knowing that, and taking FERC's position that CAISO is a flow-through entity, FERC has not explained why CAISO should not be induced to pass along the costs of CalPX's wind-up activities to its customers. To the extent that using outstanding account balances would be appropriate, FERC has erred in excluding CAISO's balance.

As to CAISO's non-profit status, we can find no reason why that status limits what it has at "stake" in the proceeding. Any number of entities operating in energy markets may be classified as non-profit, and FERC has offered no convincing reason why they should be treated differently in this case.

## III.   Conclusion

Because FERC's cost-allocation methodology is both unreasonable and violates the filed-rate doctrine, the petitions are granted, and the orders are vacated and remanded to FERC for further consideration.