# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 8, 2013      Decided February 21, 2014

No. 12-1242

BNP PARIBAS ENERGY TRADING GP,
FORMERLY KNOWN AS FORTIS ENERGY MARKETING &
TRADING GP,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PSEG ENERGY RESOURCES & TRADE LLC, ET AL.,
INTERVENORS

———

On Petitioner for Review of Order of the
Federal Energy Regulatory Commission

———

*Gordon J. Smith* argued the cause for petitioner. With him on the briefs was *Matthew T. Rick*.

*Ira Megdal* was on the briefs for intervenor South Jersey Resources Group, LLC in support of petitioner. *Marc J. Fink* entered an appearance.

*Samuel Soopper*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *David L. Morenoff*, Acting General Counsel,

and *Robert H. Solomon*, Solicitor. *Judith A. Albert*, Attorney, Federal Energy Regulatory Commission, entered an appearance.

*Michael J. Thompson* argued the cause for intervenors Transcontinental Gas Pipe Line Company, LLC, et al. With him on the briefs were *David S. Shaffer*, *David A. Glenn*, *James H. Byrd*, and *James H. Jeffries*, IV.

Before: TATEL, *Circuit Judge*, and WILLIAMS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Two firms receiving gas storage service in the Washington Storage Field ceased taking service and "released" their storage rights to petitioner BNP Paribas Energy Trading GP and intervenor South Jersey Resources Group, LLC. (Since they are similarly situated and advance the same arguments, we'll refer to the new customers collectively as "Paribas" or "the replacement shippers.") At the time of the release, the departing customers exercised their contract rights to buy back so-called "base gas" from the field's operator, Transcontinental Gas Pipe Line Company, LLC ("Transco"). Base gas is necessary in such a field to maintain pressure and thus enable users to extract "top gas" for shipment to its next destination. *Transcontinental Gas Pipe Line Corp.*, 125 FERC ¶ 63,020 at P 123 (2008) ("ALJ Decision"). The buy-back was at contractually agreed low prices reflecting the era (mid-1970s to early-1980s) when the original customers had supplied the base gas. Given the buy-back, Transco had to make new purchases to replenish its base gas so as to maintain service at the levels prevailing before the replacement.

At the time of the exiting customers' departure, the historic customers who remained, and the new replacement customers, disputed whether the cost of the new base gas should be charged entirely to the replacement shippers ("incremental pricing") or should be charged to all shippers in proportion to their usage ("rolled-in pricing"). In a decision purporting to apply the familiar "cost causation" principle, the Federal Energy Regulatory Commission chose incremental pricing. *Transcontinental Gas Pipe Line Corp.*, 130 FERC ¶ 61,043 at P 33 (2010) ("Order"); *Transcontinental Gas Pipe Line Corp.*, 139 FERC ¶ 61,002 at PP 64-68 (2012) ("Order on Rehearing"). As we'll see, the Commission failed to offer an intelligible explanation of how its decision manifested the cost causation principle. It particularly failed to explain how or why or in what sense the historic customers' *continued demand* did not share, *pro rata*, in causing the need for the new base gas, or, to put the same issue in terms that the Commission often treats as equivalent, how or why or in what sense the historic customers did not share proportionately in the benefits provided by the new base gas. And it brushed off with a terse "not relevant" Paribas's invocation of a seemingly parallel set of the Commission's own decisions. Accordingly, we vacate and remand, explaining in detail below.

\* \* \*

In 1975, at the outset of the field's operation, shippers intending to use it agreed with Transco on a means of supplying the necessary base gas. The shippers permitted Transco to take gas that they were otherwise entitled to purchase, in a quantity proportionate to each shipper's future storage rights in the field. Transco paid for the gas and held title to it. But the agreement entitled each customer to repurchase its share of the base gas on terminating service at the field. Transco enlarged the field several times between 1975 and 1981, each time buying gas that the new shippers

had been entitled to take themselves, and each time giving those shippers the right to repurchase the gas at historic cost on terminating service. On all such occasions Transco's costs were rolled into the rate base. Order on Rehearing, 139 FERC at PP 3-4.

In the late 1990s Transco filed an amended tariff that obliged it to meet any new base gas needs on its own, and to maintain enough base gas to support the field's total top gas. Because storage at the Washington field is fully subscribed, the need to purchase new gas would arise from the departure of an historic customer (assuming it took away its share of the base gas) followed by the arrival of a replacement shipper (which, with the end of the prior system, would not be providing its share of the base gas). On the other hand, an historic shipper's termination of service and repurchase of base gas, with no replacement shipper stepping in, would not in itself automatically require Transco to secure new base gas. *Id*. at PP 7-9.

Events in 2005 and 2006 triggered what appear to be the first applications of the new requirement that Transco purchase base gas outside the old purchase-repurchase arrangement. Two historic shippers, PSEG Energy Resources and Trade LLC and South Jersey Gas Company, "released" their Washington field rights to the replacement shippers now before us and exercised their right to repurchase their share of the base gas at historic cost—roughly $0.89 per dekatherm. At the time of repurchase the price of gas was roughly $6 per dekatherm. *Id*. at PP 11-12.

Transco responded by proposing a new, bifurcated tariff. The historic shippers would continue to pay a "rolled-in" rate reflecting their proportionate share of the low-cost historic base gas. Paribas, however, would pay an "incremental rate" reflecting the cost of 3.4 million dekatherms of additional gas,

most of which would have been unnecessary in the absence of replacement shippers. *Id*. at P 12-13. (According to FERC staff, 1.32 million dekatherms would have been needed even without the replacement customers. ALJ Decision, 125 FERC at PP 101-02). The parties eventually settled all issues except for the rate applicable to Paribas.

An administrative law judge rejected the proposal after finding that Transco failed to meet its burden to show that the proposed rate was just and reasonable. *Id.* at P 180. The ALJ observed that since "all base gas as a whole serves the top gas capacity and deliverability needs of all customers as a whole, it is impossible to attribute any portion of base gas to any one or more customers in any way other than *pro rata* according to each customer's top gas volume." *Id*. at P 129. And "[w]hen base gas is injected or withdrawn, the top gas capacity and deliverability needs of all customers are affected equally." *Id*. at P 130. As statements of physical reality, these propositions are, so far as appears, undisputed. And the ALJ noted specifically that consultations by Transco with the remaining historic customers might well have led them to take less gas and thus to require acquisition of less replacement base gas. *Id*. at P 133. Thus the ALJ concluded that the newly purchased gas was "as crucial to meeting the needs of [Transco's] existing customers as it was to meeting the needs of [Paribas]," *id*. at P 138, and that "no one customer's top gas allotment can be said to 'cause' more base gas cost than any other customer's," *id*. at P 129.

In the orders under review, the Commission reversed and approved Transco's rate filing, with reasoning that we will analyze below.

\* \* \*

We review the Commission's ratemaking decisions under the APA's familiar arbitrary and capricious standard. *Transcontinental Gas Pipe Line Corp. v. FERC*, 518 F.3d 916, 919 (D.C. Cir. 2008). That standard requires us to ensure that the Commission "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Id.* (quoting *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007)). Part of that requirement of course requires the Commission to provide an adequate explanation before it treats similarly situated parties differently. *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994).

The Natural Gas Act requires that rates be just and reasonable and not unduly discriminatory. 15 U.S.C. § 717c(a)-(b). The Commission has "added flesh to these bare statutory bones" through adoption of the "cost causation" principle, which requires that rates "reflect to some degree the costs actually caused by the customer who must pay them." *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992). This typically translates into a process of "comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004). The flip side of the principle is that the Commission generally may not single out a party for the full cost of a project, or even most of it, when the benefits of the project are diffuse. See *Illinois Commerce Comm'n v. FERC*, 576 F.3d 470, 476 (7th Cir. 2009); *Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1320-21 (D.C. Cir. 2004).

In a critical section of its Order on Rehearing the Commission set out to explain its "Consistency with Cost Causation Principle." Order on Rehearing, 139 FERC at PP

64-68. It saw the case as "present[ing] alternative methods of analyzing cost causation, depending upon whether the focus is on the pipeline's operations or on the events enabling each customer to join the system." *Id.* at P 64. It acknowledged the validity of the ALJ's finding that because the field was operated on an integrated basis, "all base gas injected into the field serves the top gas deliverability needs of all . . . customers, regardless of when each shipper joined the system." *Id.*

But in its "alternative" view of causation, the Commission saw the exiting historic shippers' releases to the replacement shippers as "the 'most immediate and proximate' cause" of the need to buy new base gas, as those releases obligated Transco to provide service to the replacement shippers for the remaining terms of the exiting shippers' contracts. *Id.* at P 65.

On its face, this alternative focus on the exiting shippers' release doesn't seem to support the Commission's idea that the *replacement shippers'* demand is *the* cause of the need for the additional 3.4 million dekatherms of base gas. It still places the replacement shippers in the position of any new customer whose demand, *coupled with that of the prior customers*, necessitates some new investment. Thus the Commission's characterization of *both* alternative views as "factually accurate," *id.* at P 66, seems highly questionable.

Having reached this point of supposed indeterminacy, the Commission went on to say that accordingly the weight to be given each theory of "cause" should turn on "equitable factors," *id.*, which it identified primarily as the fact of the historic shippers' having "provided essential support [for Transco's developing the field] by providing the necessary base gas out of their gas purchase entitlements during a period of severe gas shortages," *id.* at P 67.

By way of background, three observations about cost causation are relevant. First, the cost causation principle generally calls for giving the same treatment to new and continuing customers, based on a straightforward economic rationale. Where "all customers cause the incurrence of the costs . . . , whether by adding or merely continuing their usage," *Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 475 F.3d 1277, 1285 (D.C. Cir. 2007); *Town of Norwood v. FERC*, 962 F.2d 20, 24 n.1 (D.C. Cir. 1992), assignment of the costs to all customers (both continuing and new) forces each set "to weigh the marginal benefits of the capacity to them against the marginal costs they impose on society by continuing to make demands." 1 Alfred Kahn, *The Economics of Regulation* 140 (1988); *Southeastern Michigan Gas Co. v. FERC*, 133 F.3d 34, 41 (D.C. Cir. 1998) (citing Kahn); cf. *PJM Interconnection, LLC*, 128 FERC ¶ 61,157 at P 102 (2009) (recognizing, on the supply side, equivalence between new entrants and existing suppliers).

Second, the cost causation principle itself manifests a kind of equity. This is most obvious when we frame the principle (as we and the Commission often do) as a matter of making sure that burden is matched with benefit. See, e.g., *Midwest ISO Transmission Owners*, 373 F.3d at 1368; *Southeastern Michigan Gas Co.*, 133 F.3d at 41 (as "every shipper is economically marginal, the costs of increased demand may equitably be attributed to every user").

Third, despite those propositions, we have recognized that equitable factors (independent of those inherent in the cost causation principle itself) may on occasion trump that principle. *Town of Norwood*, 962 F.2d at 24 n.1.

Notwithstanding the Commission's undoubted power to rest on "equitable" principles, its moves here reveal two flaws. First, as we saw above, its basis for imputing an exclusive or

even primary causal role to the replacement shippers' demand is uncertain at best. Thus its chosen bridge to reliance on "equity" is shaky. Second, the Commission doesn't explain why the historic shippers' earlier support for the project (which left them entitled to buy back their gas and resell it at current prices) gives them a special equitable claim in perpetuity. Equity's conscience is famously "as long as the chancellor's foot"; to reconcile its use with the APA's rejection of arbitrariness requires both that the justification for shifting to "equity" and the reasons that make an outcome equitable be set forth with clarity and logic. They are missing here, and the Commission doesn't really advance its judgment that the replacement shippers' demand can be viewed as the sole cause of the base gas need by pinning on that demand the undefined label "immediate and proximate cause."

The failings of the Commission's approach here are underscored by its non-response to a specific point that Paribas raised in the administrative proceedings. There it argued that the Commission's decision was inconsistent with its application of cost causation to an analogous case in the electricity sector, namely when integration of a new electricity generator requires upgrades to the transmission network. Paribas says that in that case the Commission does not permit transmission operators to mechanically assign the cost of the upgrade to the generator that precipitated the expense, but instead requires consideration of the benefits to all parties on the integrated system. See, e.g., *Midwest Indep. Transmission Sys. Operator, Inc. & the Midwest ISO Transmission Owners*, 129 FERC ¶ 61,060 at PP 53-56 (2009); *Order No. 2003-A, Standardization of Generator Interconnection Agreements & Procedures*, 106 FERC ¶ 61,220 at PP 585-86 (2004); *Re Public Service Co. of Colorado*, 62 FERC ¶ 61,013, 61,061 (1993). It inquires whether the upgrade benefits all users of the grid or just the additional generator, and does not "require the Generator to bear costs incurred for the development of

equipment that benefits all users of the network." *Entergy Services, Inc. v. FERC*, 391 F.3d 1240, 1243 (D.C. Cir. 2004). Yet when Paribas pointed out the apparent inconsistency between FERC's action here and its management of the electricity sector, the Commission brushed it off as "not relevant to this case." Order on Rehearing, 139 FERC at P 77; see FERC Br. 21. Such an opaque dismissal of an analogy falls well short of the APA's requirement that the Commission "provide an adequate explanation to justify treating similarly situated parties differently," *Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008); accord *Am. Min. Cong. v. EPA*, 907 F.2d 1179, 1191 (D.C. Cir. 1990).

Whatever the reason for rejecting the analogy from electricity regulation (if there is one), it cannot be that the distinctions between gas and electricity, or between the Natural Gas Act and the Federal Power Act, ipso facto put an electricity analysis out of court. We have routinely relied on the two statutes' rough equivalence, looking to natural gas analogs when assessing electricity regulation and vice-versa. *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 686 (D.C. Cir. 2000) (applying principles of natural gas regulation to electricity); *Am. Gas Ass'n v. FERC*, 912 F.2d 1496, 1506 (D.C. Cir. 1990) (applying principles of electricity regulation to natural gas). To be clear, we are not suggesting that the Commission must always regulate the natural gas and electricity industries identically. Indeed, it often does not. E.g., *Re Northeast Utilities Service Co.*, 62 FERC ¶ 61,294, 62,923 (Mar. 26, 1993). FERC may point to distinguishing facts or established policy, but it may not dismiss a material argument out-of-hand.

Transco, intervening in support of the Commission, appears to suggest that any error is immaterial because even in the case of a network upgrade the Commission permits incremental rates in certain circumstances. Transco Br. 27-28.

Even assuming those circumstances to be present here, the Commission's reliance on the exception would have given Paribas a chance to argue against its applicability. But the Commission's outright dismissal of Paribas's analogy provides no rationale for us to review.

In short, the Commission has failed to offer a reasoned basis for its conclusion.

* * *

Although we find that the Commission's response to Paribas's contentions was arbitrary and capricious, we do not mean to suggest that on remand the Commission is to ignore the complex history of the Washington field. The historic shippers have consistently refrained from leaving the field and reaping the potential windfall from exercising their contingent option to purchase their share of the base gas. By so refraining, they annually incur, as a cost of continuing to take service, the foregone return on the proceeds of selling that gas. It may be that the Commission could, consistent with regarding all shippers as causing the need for the purchase of additional base gas in proportion to their use of the field, nevertheless require the replacement shippers to pay the incremental cost, while allowing the historic shippers to pay the previously calculated rate *and* continue to forego the annualized return from exercise of their buy-back option. If this analysis is correct, such a rate treatment could subject all shippers to similar incentives for similar use of the field. As the Commission did not broach such an analysis, it would obviously be inappropriate for us to adopt it. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). But we cannot affirm on the basis of a Commission rationale that fails to respond to critical arguments raised before the agency. Accordingly, the Commission's order is

12

*Vacated and remanded.*