# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 15, 2021        Decided March 2, 2021

No. 19-1091

PUBLIC SERVICE ELECTRIC AND GAS COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NEW JERSEY BOARD OF PUBLIC UTILITIES, ET AL.,
INTERVENORS

———

Consolidated with 20-1039

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*John Longstreth* argued the cause for petitioners. With him on the briefs were *Cara J. Lewis*, *Donald A. Kaplan, Kimberly B. Frank,* and *Steven Nadel. William M. Keyser III* entered an appearance.

*Gurbir S. Grewal,* Attorney General, Office of the Attorney General for the State of New Jersey, *Paul Youchak*, Deputy Attorney General, and *Stefanie A. Brand*, Director,

New Jersey Division of Rate Counsel, were on the brief for intervenor New Jersey Board of Public Utilities and New Jersey Division of Rate Counsel in support of petitioners. *Alex Moreau,* Attorney, Office of the Attorney General for the State of New Jersey, *Stephen C. Pearson,* and *Scott H. Strauss* entered appearances.

*Elizabeth E. Rylander*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *David L. Morenoff*, Acting General Counsel, and *Robert H. Solomon*, Solicitor.

*Robert A. Weishaar, Jr., Kenneth R. Stark, Thomas L. Rudebusch, Bhaveeta K. Mody, Timothy G. McCormick, William F. Fields, Joseph G. Cleaver, Michael R. Engleman, Regina A. Iorii, Miles H. Mitchell, Adrienne E. Clair,* and *Rebecca L. Shelton* were on the brief for intervenor Public Service Commission for the State of Delaware, et al. in support of respondent. *Kayla Grant* entered an appearance.

Before: SRINIVASAN, *Chief Judge*, ROGERS, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Public Service Electric and Gas Company and PPL Electric Utilities Corporation petition for review of three orders of the Federal Energy Regulatory Commission concerning cost sharing for certain upgrades to the Mid–Atlantic electricity transmission grid. In 2016, the Commission approved as just and reasonable cost allocations filed by PJM Interconnection, L.L.C. ("PJM"), the Mid–Atlantic's regional transmission organization, for a project to improve the reliability of three nuclear power plants in New Jersey. In so doing, the Commission denied a complaint lodged

by Delaware and Maryland alleging a large imbalance between the costs imposed on the Delmarva transmission zone and the benefits that zone would accrue from the project. On rehearing in 2018, however, the Commission reversed course, concluding that, upon reexamination of the evidence, application of PJM's cost–allocation method to the project violated cost–causation principles and was therefore unjust and unreasonable in violation of section 206 of the Federal Power Act, 16 U.S.C. § 824e. The Commission's replacement cost–allocation method shifted primary cost responsibility for the project from the Delmarva zone to utilities in New Jersey.

Petitioners, PJM transmission owners, and intervenors New Jersey Board of Public Utilities and New Jersey Division of Rate Counsel ("New Jersey Agencies") contest the rationality of the Commission's volte–face. They contend the Commission departed from precedent without adequate explanation, made findings that are unsupported by substantial evidence, and failed to respond meaningfully to objections raised during the proceedings. For its part, the Commission, with support from a coalition of Delaware and Maryland stakeholders, maintains that it engaged in reasoned decisionmaking. We conclude the Commission reasonably decided to adopt a different cost–allocation method for the type of project at issue here and adequately explained its departure from the cost allocations it had approved in 2016. Accordingly, we deny the petitions for review.

**I.**

The Federal Power Act requires that the Commission ensure the rates charged by public utilities to provide electricity are "just and reasonable." 16 U.S.C. § 824d(a). Pursuant to section 206 of the Federal Power Act, the Commission may investigate — on its own initiative or based on a third–party

complaint — whether an existing rate is "unjust, unreasonable, unduly discriminatory or preferential." *Id.* § 824e(a). The proponent of the rate change bears the burden of proof, and, if the Commission determines that the rate is unlawful, it must establish a just and reasonable replacement rate. *Id.* § 824e(a), (b). Section 206 therefore "mandates a two–step procedure" whereby the Commission must "make an explicit finding that the existing rate is unlawful before setting a new rate." *Emera Me. v. FERC*, 854 F.3d 9, 24 (D.C. Cir. 2017). Thus, "[w]ithout a showing that the existing rate is unlawful," the Commission "has no authority to impose a new rate." *Id.* at 25.

The Commission has long viewed the just–and–reasonable requirement to "incorporate a 'cost–causation principle.'" *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1255 (D.C. Cir. 2018). That "principle requires costs 'to be allocated to those who cause the costs to be incurred and reap the resulting benefits.'" *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 87 (D.C. Cir. 2014) (quoting *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1285 (D.C. Cir. 2007)). So, although the Commission need not "allocate costs with exacting precision," the costs assessed against a party must bear some resemblance "to the burdens imposed or benefits drawn by that party." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368–69 (D.C. Cir. 2004). In practice, this means "the Commission generally may not single out a party for the full cost of a project, or even most of it, when the benefits of the project are diffuse." *BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 268 (D.C. Cir. 2014).

Consistent with the cost–causation principle, the Commission issued "Order No. 1000" in 2011 to foster the efficient development of the transmission grid. *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, F.E.R.C. Stats. & Regs. ¶ 31,323,

76 Fed. Reg. 49,842 (Aug. 11, 2011), *petitions for review denied*, *S.C. Pub. Serv. Auth.*, 762 F.3d 41. Among other things, Order No. 1000 requires utilities to participate in regional transmission planning and to include in their tariffs a formula "for allocating the costs of new transmission facilities selected in the regional transmission plan." *Id.* at P 558, 76 Fed. Reg. at 49,929. To comply with Order No. 1000, a utility's cost–allocation method must satisfy six criteria, the first of which embodies the cost–causation principle by requiring that costs be "allocated in a way that is roughly commensurate with benefits." *Id.* at P 622, 76 Fed. Reg. at 49,937.

### A.

PJM is an independent entity that coordinates the transmission of wholesale electricity in the Mid–Atlantic region. In accordance with Order No. 1000, Schedule 12 of PJM's Open Access Transmission Tariff outlines its cost–sharing requirements, which the Commission accepted in 2013. *PJM Interconnection, L.L.C.*, 142 F.E.R.C. ¶ 61,214 at PP 411–12 (Mar. 22, 2013), *order on reh'g & compliance*, 147 F.E.R.C. ¶ 61,128 (May 15, 2014). As relevant here, PJM uses a combination of two methods to assign the costs of high–voltage transmission facilities built to improve grid reliability. *Id.* at P 412. Half of the cost is allocated under the "postage–stamp method," which assigns costs pro rata based on the level of customer demand within each zone. *Id.* The other half is apportioned using the "Solution–Based DFAX method." *Id.* Relying on "power flow analysis," that method assigns costs according to the relative use of the new facility as measured by the amount of power flowing over the new facility to each transmission zone. *Id.* at P 416. Solution–based DFAX replaced PJM's "violation–based DFAX" method, which assigned costs retrospectively to the zones that contributed to

the reliability violation. In approving the new method, the Commission touted the advantages of assigning costs prospectively to the zones that will benefit from the project, noting that the violation–based DFAX method "does not account for multiple constraints in multiple areas, and cannot account for changes in usage and flow direction over time." *Id.* at P 427.

Located on the New Jersey side of the Delaware River, Artificial Island is home to three nuclear power plants owned by a subsidiary of petitioner Public Service Electric and Gas Company. These generating units have long been plagued by operational issues stemming from an insufficient number of transmission lines connecting Artificial Island to the grid. Generation is constrained when one of the lines is out of service, and various components of the transmission system require careful management to prevent the power plants from becoming unstable and losing synchronism with the grid. Such losses of synchronism are referred to as "stability" problems.

**B.**

In July 2013, PJM solicited proposals to improve the reliability of Artificial Island. *See* PJM, Artificial Island Project Recommendation White Paper 1 (July 29, 2015). After two years of study, PJM selected the "Artificial Island Project," which primarily entails the construction of a high–voltage line under the Delaware River to connect the power plants to a new substation in Delaware. Letter from Terry Boston, PJM, to PJM Members Committee (July 29, 2015); PJM 2015 White Paper 35–37. Under PJM's hybrid cost–allocation method, nearly 90 percent of the Artificial Island Project's $275.4 million cost was assigned to the Delmarva transmission zone. PJM 2015 White Paper 38.

On August 28, 2015, PJM filed with the Commission proposed cost allocations for the Artificial Island Project. PJM, Tariff Filing (Aug. 28, 2015). The same day, the Delaware and Maryland Public Service Commissions filed a complaint with the Commission pursuant to section 206 of the Federal Power Act protesting PJM's cost assignments as unjust and unreasonable. Applying the solution–based DFAX method to the Artificial Island Project was unjust, they argued, because when used to allocate the costs of a facility that addresses "inadequate outlets for generation output, the solution–based DFAX methodology invariably will link cost responsibility with the zone that just happens to be the end–point for the new or expanded generation output." Compl. ¶ 32 (Aug. 28, 2015). A group of PJM transmission owners intervened in support of PJM's proposed tariff.

Following a technical conference, the Commission accepted PJM's cost allocations and denied the complaint in April 2016. *Del. Pub. Serv. Comm'n*, 155 F.E.R.C. ¶ 61,090 at PP 65–76 (Apr. 22, 2016) ("2016 Order"). The Commission rejected the argument that use of the solution–based DFAX method was inappropriate, observing that "even if a stability violation is the primary driver of a transmission project," the method "allocates costs . . . based on use of the facilities." *Id.* at P 68. The Commission similarly found unpersuasive the argument that PJM's cost assignments were unjust because the Delmarva zone did not contribute to the need for the Artificial Island Project. That argument misunderstood the solution–based DFAX method, which focuses on "the identification of beneficiaries," "not the initial nature of the reliability problem." *Id.* at P 69. One Commissioner dissented, explaining that, in her view, the record established that PJM's flow–based cost–allocation methodology fails to align costs with benefits when the project addresses reliability violations

unrelated to power flows. *See id.* (LaFleur, Comm'r, dissenting).

Delaware and Maryland requested rehearing, but before the Commission acted, PJM suspended the Artificial Island Project. Letter from Pauline Foley, PJM, to FERC Secretary Kimberly D. Bose (Aug. 5, 2016). When PJM lifted the suspension in April 2017, it acknowledged that "the DFAX Methodology can result in cost allocations that seem anomalous where the engineering rationale or need for a project is not one driven by power flow." Letter from Andrew Ott, PJM, to PJM Members (Apr. 6, 2017). To that end, PJM released a white paper assessing two alternative approaches to identify the beneficiaries of the Artificial Island Project. *See* PJM, Alternative Approaches to Identification of Artificial Island Beneficiaries (June 9, 2017). Soon after, Delaware and Maryland renewed their request for rehearing and also moved to reopen the record. *See* Mot. to Reopen the Record (Sept. 6, 2017).

In July 2018, the Commission granted rehearing of the 2016 Order, concluding that using the solution–based DFAX method to assign the cost of the Artificial Island Project violated the cost–causation principle and was therefore unjust and unreasonable. *Del. Pub. Serv. Comm'n*, 164 F.E.R.C. ¶ 61,035 at PP 36–41 (July 19, 2018) ("2018 Order"). The Commission observed that the solution–based DFAX method "is a reasonable method for identifying beneficiaries of thermal overload and voltage related reliability issues" because when a facility resolves a flow–based reliability issue, "the beneficiaries of that solution are readily identified based upon those power flows." *Id.* at P 39. However, "stability–related reliability issues" are "analytically unique," the Commission explained, because they "result from an imbalance of generation and load" and, "depend[ing] on the nature of the

problem," can "be either a very local event or spread into a more substantial problem." *Id.* at P 40. As a result, the Commission found that the benefits of a facility built to stabilize a specific generating unit are "not necessarily captured" by measuring power flows. *Id.* P 41. The Commission thus determined that the solution–based DFAX method "does not allocate the costs of such transmission projects in a manner that is at least roughly commensurate with their benefits." *Id.* at P 38. Having so ruled, the Commission established paper hearing procedures to select a new cost–allocation method. *Id.* at P 42.

This time, the PJM transmission owners and New Jersey Agencies filed a request for rehearing. *See* Req. for Reh'g of PJM Transmission Owners (Aug. 20, 2018); Req. for Reh'g of N.J. Bd. of Pub. Util. Pub. Utilities & N.J. Div. of Rate Counsel (Aug. 20, 2018). They argued the Commission's reversal of the 2016 Order was arbitrary and capricious because it was inadequately explained, lacked substantial evidence, and improperly focused on assigning costs to violators rather than beneficiaries. They also maintained that the 2018 Order was inconsistent with Order 1000 and that the Commission failed to respond meaningfully to their arguments against rehearing.

The Commission denied the requests for rehearing in February 2019. *Del. Pub. Serv. Comm'n*, 166 F.E.R.C. ¶ 61,161 at PP 38–42 (Feb. 28, 2019) ("2019 Order"). The Commission first affirmed its conclusion that the solution–based DFAX method does not allocate the cost of the Artificial Island Project in a just and reasonable manner. *Id.* at PP 37–40. Next, the Commission responded to the argument that it acted arbitrarily because it offered no new evidence to overturn the 2016 Order, stating that its decision was "based on further consideration of th[e] existing record" and the parties' arguments." *Id.* at P 41. Finally, the Commission rejected the

argument that it erred in reopening the record. The Commission explained that it "did not rely on the PJM White Paper in granting rehearing" but instead considered that evidence only "to determine the just and reasonable alternative rate." *Id.* at P 42. The Commission then selected a replacement method, which was one of two methods advanced in the White Paper, and directed PJM to file a revised tariff implementing its order. *Id.* at P 43. Not challenged here, the Commission's new method shifted primary cost responsibility for the Artificial Island Project from the Delmarva zone to utilities in New Jersey.

Following minor modifications by the Commission to PJM's compliance filing, *see Del. Pub. Serv. Comm'n*, 169 F.E.R.C. ¶ 61,234 (Dec. 19, 2019), Petitioners timely sought judicial review.

## II.

The court's review of the Commission's orders is limited to determining whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016). The court will affirm the Commission's orders so long as it "examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Elec. Power Supply Ass'n*, 136 S. Ct. at 782 (alterations adopted) (quoting *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Further, where, as here, the dispute centers on the Commission's exercise of its rate–setting authority, the court is "particularly deferential" to the Commission's determinations "because such matters are either fairly technical or 'involve policy judgments that lie at the core of the regulatory

mission.'" *S.C. Pub. Serv. Auth.*, 762 F.3d at 55 (quoting *Alcoa Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C. Cir. 2009)). All that said, the court will vacate the Commission's orders if the "allocation of costs [is] either unreasonable or inadequately explained." *Old Dominion*, 898 F.3d at 1260 (internal citations omitted). And, like other agencies, the Commission "cannot depart from [its] rulings without 'provid[ing] a reasoned analysis indicating that prior policies and standards are being deliberately changed.'" *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 17 (D.C. Cir. 2014) (second alteration in original) (quoting *Alcoa*, 564 F.3d at 1347).

Petitioners and New Jersey Agencies challenge the Commission's decision to grant rehearing of the 2016 Order on three grounds. Their principal contention is that the Commission failed to adequately justify its finding that the solution–based DFAX method is unjust and unreasonable as applied to the Artificial Island Project. Petitioners additionally contend the Commission's decision is contrary to Order No. 1000. Finally, Petitioners and New Jersey Agencies submit the Commission failed to meaningfully respond to their arguments in support of the solution–based DFAX method and in opposition to reopening the record. None of these challenges has merit.

**A.**

In the main, Petitioners and New Jersey Agencies contend the Commission failed to carry its burden under section 206 and acted arbitrarily by changing its position from approving the use of the solution–based DFAX method to assign the cost of the Artificial Island Project to finding those cost allocations unjust and unreasonable. The Commission, they maintain, failed to address its initial findings in either the 2018 or 2019 Order. They further maintain the Commission's decision to

grant rehearing rests on insufficient evidence because it pointed to no new evidence or change in circumstances that undercut its prior conclusions that the solution–based DFAX method identifies the beneficiaries of stability–related reliability projects and that the Delmarva zone will benefit from Artificial Island Project.

The Commission's decision to grant rehearing of the 2016 Order is neither arbitrary nor capricious and is consistent with its statutory obligations under section 206. As an initial matter, the Commission did not, as Petitioners suggest, "swerve[]" from the 2016 Order "without any acknowledgment." Pet'rs' Br. 54. To the contrary, the Commission expressly acknowledged its change of position in the 2018 Order. There, the Commission stated that, "based on the arguments presented in the rehearing requests," it was "grant[ing] rehearing of the April 22, 2016 Order" and therefore would "reopen the record and seek additional information . . . to establish the just and reasonable rate." 2018 Order, 164 F.E.R.C. ¶ 61,035 at P 36. The Commission then proceeded to explain in detail why it was unjust and unreasonable to rely on the solution–based DFAX method to distribute the costs of stability–related reliability projects — the exact opposite conclusion it reached in 2016. This analysis demonstrates that the Commission was consciously changing its position.

That change of position is also adequately explained and supported by substantial evidence. In 2016, the Commission approved PJM's cost allocations for the Artificial Island Project based on its conclusion that the solution–based DFAX method accurately identifies the beneficiaries of transmission facilities addressing stability–related reliability issues. *See* 2016 Order, 155 F.E.R.C. ¶ 61,090 at PP 67–68. On rehearing, the Commission recognized that this conclusion was erroneous because flow–based reliability issues and stability–related

reliability issues are "analytically unique." 2018 Order, 164 F.E.R.C. ¶ 61,035 at P 38. For example, reliability issues caused by thermal overload are solved by increasing the amount of power flowing to the constrained region. In these circumstances, "the beneficiaries of that solution are readily identified based upon those power flows" because "change[s] in power flows are consistent with the intended solution." *Id.* at P 39. By contrast, stability issues arise from the inability of a particular generating unit to maintain synchronism with the grid, which in turn can result in constrained generation as well as facility outages. *Id.* at P 40. And whereas flow–based issues are solved by bringing power to a constrained area, stability–related issues are solved by providing additional transmission pathways from the generator to the grid. Thus, because "the flows on a transmission project to resolve a stability–related reliability issue do not necessarily resolve a constraint by bringing power to load," *id.*, the Commission found that the beneficiaries of such a project "are not necessarily captured" by following the electrons to their end–point, *id.* at P 41.

Applying this new framework, the Commission reasonably found that the solution–based DFAX method was unjust and unreasonable as applied to the Artificial Island Project. As the Commission explained in the 2019 Order, because the need for the Artificial Island Project stems from the inability of transmission zones in New Jersey to fully absorb the power plants' generation, those zones "both contribute to the need for, and will benefit from, a transmission project that will increase stability performance." 2019 Order, 166 F.E.R.C. ¶ 61,161 at P 39. The Delmarva zone, however, "neither caused the need for the line nor does it benefit from those flows sufficiently because its transmission system already was adequate to serve its load without the Artificial Island Project." *Id.* at P 40. Instead, the Delmarva zone was the "unlucky zone that happen[ed] to end up as the sink point for the project." *Id.* at P

39 n.40. Given these findings, the Commission concluded that assigning nearly 90 percent of the Artificial Island Project's cost to the Delmarva zone "would not be at least roughly commensurate with the benefits received" as Order No. 1000 required and violated section 206. *Id.* at P 40. Because this explanation is reasonable and supported by the record, we defer to the Commission's technical judgments.

Petitioners nonetheless insist that the Commission's orders are defective because it never disavowed the finding in the 2016 Order that the Delmarva zone will benefit from the Artificial Island Project. Pet'rs' Reply Br. 14; Oral Arg. Recording 7:00–7:30. Initially, the Commission found that the Delmarva zone would "receive significant benefits" from the Artificial Island Project." 2016 Order, 155 F.E.R.C. ¶ 61,090 at P 72. But Petitioners overlook the context of this finding, specifically that these benefits were based on "the results of the solution–based DFAX analysis." *Id.* Subsequently, the Commission determined this method does not accurately measure the benefits of the Artificial Island Project. As the Commission explained in the 2019 Order, although the Delmarva zone "will use the Artificial Island Project as measured by the solution–based DFAX method," it would not actually derive any "benefit from those flows . . . because its transmission system already was adequate to serve its load." 2019 Order, 166 F.E.R.C. ¶ 61,161 at P 40. Petitioners' contentions therefore provide no basis to set aside the Commission's decision to grant rehearing of the 2016 Order.

**B.**

Petitioners additionally maintain that the Commission's decision to grant rehearing is contrary to Order No. 1000's directive that cost–allocation rules be set *ex ante* so as to

prevent *ad hoc* decisionmaking and internecine conflicts among utilities. This contention is not persuasive.

To begin, Order No. 1000 does not concern the Commission; it requires *transmission owners* to have in place cost–allocation methods for certain transmission facilities. Nor does Order No. 1000 purport to constrain the Commission's ability to comply with its statutory obligation under section 206, which provides that the Commission "shall" reform "any rate" that is "unjust, unreasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a). Insofar as any tension may exist between Order No. 1000's goals and the Commission's exercise of its section 206 authority, "a regulation can never 'trump the plain meaning of a statute.'" *Texas v. EPA*, 726 F.3d 180, 195 (D.C. Cir. 2013) (quoting *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 11 (D.C. Cir. 2002)).

The Commission's decision to grant rehearing of the 2016 Order comports with Order No. 1000. As noted, the animating purpose of Order No. 1000 is to promote the efficient and cost–effective construction of new transmission facilities that provide region–wide benefits. *See S.C. Pub. Auth.*, 762 F.3d at 52. Order No. 1000's cost–allocation provisions, which codify the cost–causation principle, "further that goal" by requiring transmission owners to agree *ex ante* to rate–distribution methods "that avoid free rider problems, that improve transparency with respect to the costs of interregional projects, and that otherwise align regional and interregional planning processes." *Ameren Servs. Co. v. FERC*, 893 F.3d 786, 789 (D.C. Cir. 2018). Here, the Commission determined in the 2018 Order that, when applied to stability–related reliability projects such as the Artificial Island Project, the solution–based DFAX method does not assign costs "in a manner that is at least roughly commensurate with their benefits." 2018 Order, 164 F.E.R.C. ¶ 61,035 at P 38. In other words, the Commission

found that PJM's proposed cost allocations "would violate Order 1000's core cost–allocation principle." *Ameren Servs.*, 893 F.3d at 794. The Commission's decision to grant rehearing and identify a replacement cost–allocation method was therefore not inconsistent with Order No. 1000.

## C.

Finally, Petitioners and New Jersey Agencies contend the Commission's failure to meaningfully respond to their arguments against reopening the record and in favor of rehearing the 2018 Order renders its orders arbitrary and capricious. "It is well established that the Commission must 'respond meaningfully to the arguments raised before it.'" *New England Power Generators Ass'n, Inc. v. FERC*, 881 F.3d 202, 210 (D.C. Cir. 2018) (quoting *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015)). The Commission, however, must respond only to "significant comments"; it is "free to ignore insignificant ones." *Nat'l Ass'n of Regul. Util. Comm'rs*, 475 F.3d at 1285. That is all the Commission did here.

Petitioners raised a single argument in opposing Delaware and Maryland's request for rehearing of the 2016 Order: that the existence of superior alternative cost–allocation methodologies did not provide a basis to discard the solution–based DFAX method. *See* Answer in Opp'n of the PJM Transmission Owners to Mot. to Reopen the Record & Lodge 6–11 (Sept. 21, 2017). This argument was not ignored. The Commission expressly acknowledged the argument in the 2018 Order. 2018 Order, 164 F.E.R.C. ¶ 61,035 at P 26 n.35. And it necessarily rejected the premise of Petitioners' argument by finding that, as applied to the Artificial Island Project, the solution–based DFAX method was not inferior to other methods but, in fact, unjust and unreasonable. *Id.* at P 41.

Nor did the Commission disregard Petitioners' objections in their request for rehearing. In pursuit of rehearing, Petitioners argued the 2018 Order was defective because the Commission (1) changed its position without substantial evidence or adequate explanation; (2) improperly focused on aligning costs to causes rather than beneficiaries; (3) acted inconsistent with Order No. 1000; and (4) failed to address their arguments in the 2018 Order. *See* Req. for Reh'g of the PJM Transmission Owners 7–17. Here too, the Commission summarized Petitioners' arguments in the 2019 Order and meaningfully responded to them by defending its finding that the cost allocations for the Artificial Island Project generated by the solution–based DFAX method failed Order No. 1000's cost–causation requirement. 2019 Order, 166 F.E.R.C. ¶ 61,161 at PP 33–34, 38–41. To the extent the Commission did not expressly address Petitioners' contention that its decision clashed with Order No. 1000, this objection was of no significance for the reasons explained, and the Commission did not err by ignoring it.

New Jersey Agencies' contention that the Commission ignored their objections to reopening the record is likewise unavailing. They are correct that despite acknowledging their opposition to reopening the record in the 2018 Order, *see* 2018 Order, 164 F.E.R.C. ¶ 61,035 at P 11, the Commission did not address their arguments. Nonetheless, the 2019 Order makes clear that these comments were not significant. As the Commission explained there, it decided to grant rehearing of the 2016 Order based on reconsideration of the existing record and the parties' arguments. 2019 Order, 166 F.E.R.C. ¶ 61,161 at P 41. Although the Commission granted the motion to reopen the record, no basis is offered for the court to question the Commission's statement that it "did not rely on the PJM White Paper in granting rehearing of the April 2016 Order," *id.*

at P 42, which is the only decision New Jersey Agencies challenge.

Accordingly, we deny the petitions for review.